Good morning, Your Honors. Michael McNeely for Keith Foster. May it please the Court. My intention, if I'm successful, is to reserve several minutes. How many? Five. Okay, we'll try to help you but keep your eye on the clock. Your Honors, this is a difficult case, at least it was for me to brief, because it's so highly fact-specific. And that's why our jury was convicted of two counts involving conspiracy to possess and distribute or possess with intent to distribute heroin and marijuana. Both of these were at the tail end of a much larger case the government presented against Mr. Foster. Mr. Foster's jury did not reach a verdict on the much larger and much more well-substantiated allegations. So the government is left today trying to defend two add-on conspiracies that were largely established in court only by playing recordings of the defendants' conversations. If I may ask you a quick question. These wiretap conversations were the basis of his conviction. Yes, Your Honor. And your client contends that he was lying to the people on the phone when he had these conversations. That's correct, Your Honor. If the jury found that he was not lying when he spoke to those people on the phone, would there be sufficient evidence for a rational juror to conclude Foster was personally interested in the transactions and not merely part of a police project? I don't believe there would, Your Honor. But let me back up first by saying so. So even if the jury believed what he was saying was what he intended and was not lying, there's still not enough evidence? That's my argument, yes. And first, I would note that the key issue for us is the Rule 29 motion. The issue Your Honor is raising goes to the heart of the Rule 29 motion. That decision should have been made on the sufficiency of the evidence before the allegation of which Your Honor has quoted has ever been made. Before the rule 29 motion that wasn't made. That's correct, Your Honor. Thank you. Thank you, Judge, for it. Had trial counsel made the Rule 29 motion when he should have, the issue Your Honor has raised, Judge Reyes, about the what Mr. Foster said on the stand would not come into play at all. The Court would have had to make the determination entirely on the evidence that was presented. Now, my colleague ---- Well, that's my question. We're not too ---- I'm not asking you about what Foster said on the stand. He said they were lying, that he was lying when he made those conversations. All I'm saying is the transcripts of these wiretap conversations were presented to the jury in the government's case in chief, right? That's correct. Most of them. And where the ---- and his defense was, those were all lies. I was only lying when I was on the phone saying I was part of this conspiracy. This is really part of a police entrapment or a police case that we're trying to develop. That was the ---- If the jury believed when they heard those conversations that Foster was truly involved, like he appeared to on those conversations, wouldn't that be enough evidence for the conviction? No. Just like in Loveland, the fact that somebody was actively purchasing and then selling methamphetamine was not sufficient to establish a conspiracy. That's the issue here. It's not whether Foster did anything wrong. It's whether he did what the government charged him with and whether the government can prove it. Counsel, I ---- that's a very confusing argument in my judgment. I know you want to get to the buyer-seller thing. That's a separate issue. But in this case, is not my colleague correct that this is a jury determination? Your client said he was lying when he was tape recorded. If the jury didn't believe him, I mean, all the elements were all there. He said all these things, and what's the problem? The question is, when was he lying? Well, so let me correct the whether he said he was lying. Heroin and marijuana, I believe, were presented differently to the jury. With regard to the heroin, Rafael Guzman was somebody who was facing a then-State charge with a seven-year potential sentence. And in Foster's testimony, he said that he was helping ---- trying to attempt to make something happen with Guzman so that he could use that to leverage him as a cooperator. He was basically doing the same thing with Denny Foster. The difference was Denny Foster had actually met with police officials and had been involved in some of those things. But the point I would like to make, and it's difficult to make because it involves me asking you to set aside what my client has said, is the judge, the trial judge, should have made this decision and should have been presented with the opportunity to make this decision before any of the arguments or any of the testimony Your Honor is quoting has been heard. The government has introduced the three large exhibits to you. Only two of them were heard by the jury before the defense case began. So bottom line is instead of what you're saying to my colleagues is you're really relying entirely on the IAC claim. You're saying there should have been a motion made, and had it been made, the judge would clearly have ruled the way you want it. Is that what you're saying? Sort of, Your Honor. I'm asking you to go back in time to the conclusion of the government's case and had the ---- exactly. Had the Rule 29 motion been made at that point, which is what I'm asking you to do now. Let me just ---- before the government closed and the Rule 29 motion was available to be made, the tape recordings have been played and the transcript has been shown to the jury of those conversations. Two of the three. The third that has been presented to you was not played at that point. It was introduced after the defense pointed that out, after the defense case began. So if you've listened to them, it's difficult, I know, and there's about 40 minutes on each one. In the first, Heroin, the conversation is between Keith Foster and LaShawn Jones. We don't know who LaShawn Jones is. She's not been charged with an offense. She never appeared in court. In it, he appears to want to help her obtain something. He says, I'm working with a guy to do it. The government then plays calls contemporaneous in time to Rafael Guzman, and in at least one of them he leaves a message, and then when he speaks to Jones again, he says, I just left a message with my guy. So the government says there's an inference that he's actually working with Guzman. But again, counsel, with respect, that's what juries are for. They hear this evidence. You claim it meant one thing. The government claims it meant something else, and the jury said, you know, we believe the government in this case. Your fallback is the buyer-seller thing, but your client specifically disclaimed any buyer-seller relationship. So let's put that one to the side. You're really talking about whether or not the jury had enough evidence to believe it, right? Your Honor, we believe they were misinstructed. The buyer-seller relationship has not been argued by the defense. It was argued by the government. The court should have given the buyer-seller instruction. Well, let's say it had been argued. Your client expressly disclaimed any involvement in a buyer-seller relationship. So that's the end of that, right? Even if it had been instructed. With regard to the defense case that was presented, my client did not intend to say that he was involved in a transaction like that. I'm pointing out to the court. Wait, wait, wait. Say that again. Your Honor is absolutely correct. My client did not make that argument at trial. He expressly claimed he wasn't involved in that, right? That's correct. But again you're saying we shouldn't believe him what he said because he really meant to say something different. I'm asking you to consider the sufficiency of the evidence on a Rule 29 motion that should have been made at the close of the government's case. That's your best argument. I believe it is. Okay. I believe that counsel failed and absolutely got it wrong. There is no tactical reason not to make a Rule 29 motion. There is no cost to the defense to do it. And in fact, there is extreme cost to have made it, to have not made it. Well, I don't think anyone's questioning that. The question is, was there sufficient evidence of the crimes he's been convicted of in the transcripts of the wiretap conversations? And I believe there are not. If you were to- If you were, okay, you make the motion now. Yes. In 45 seconds as to what counsel should have said. Counsel should have said, Your Honor, it looks very bad for Deputy Chief Foster. It looks like he clearly knew people in his life were involved in drugs. It may even look like he was involved with people that may have been trying to pursue a transaction. But if you read carefully between the lines and see what he did, he never facilitated, he never benefited. He may have never even intended for it to happen. It may have been simply the fact that he was shining these people on to continue to maintain sources and contacts. He never put anything together with Rafael Guzman or advised him. He didn't protect Denny Foster when Denny Foster was muelling pounds of marijuana up the hill. He didn't do anything other than speak on the telephone, and no one has been brought before you, as I'm speaking to Judge Ishii, to tell you that they were in a conspiracy with this man. That's the difference between this case and all of the others that we've cited that this that your Court has overturned, cases like Loveland, where there was clearly guilt of drug sales. There is no conspirator. Then the jury could not have inferred from those conversations that there was an agreement. The jury shouldn't have inferred. They got it wrong, I believe, because they were wrongly instructed. They weren't told that it is entirely possible for a criminal act to have occurred, like in Loveland, but it not rise to the level of a conspiracy. They were not informed about the limits of conspiracy and the fact that conspiracy is the thought crime. And I know it's not as a ---- Sotomayor, back to the instructions. Okay. And what would the instruction have said to do what you're just talking about? The instruction would have been the model jury instruction that talks about the Loveland case and I believe is also based on the Lennock case. And it talks about the fact that somebody who purchases narcotics from a conspiracy isn't necessarily acting in regard to that conspiracy. There has to be an intention between the two of them to act together. And that's why you're getting over the buyer-seller thing again, then, right? And I believe that's what the government was arguing. I believe the government's inferences are based on that. May I reserve the balance of my time? Sure, of course. Thank you. I'll bet the government disagrees. That's correct, Your Honor. Good morning. May it please the Court. My name is Henry Carbajal. I represent the United States in this matter. The evidence at trial showed that Defendant Foster communicated with co-conspirators to get both heroin and marijuana, and it was for the purpose of resale and to make a profit. His words on those communications, plus his admissions after his arrest, and add to it the jury's rejections of his denials at trial show that the evidence was sufficient and these convictions should be affirmed. Let's talk — let me talk for a moment about the sufficiency of the evidence with respect to the heroin conspiracy. It starts with a telephone call from Defendant Foster to LaShawn Jones, where she is discussing, in code, getting narcotics, getting that large amount. Foster then calls Guzman to ask him about the black, which is a slang term for heroin, as was confirmed by the testimony at trial. I'm just curious. Was there somebody at trial who explained to the jury what that code language was? Yes. That was ATF Agent Sherry Reynolds. And that — the explanation of the black is at ER 1173. That's a testimony from Agent Reynolds. And this is before the defense case. This isn't the government's case in chief. And then the terms China White, RAC, meaning $1,000. That's ER 1173 to 74. So there was testimony from the ATF agent on those terms. And then during the defense case, Defendant Foster confirmed what those terms mean. It was consistent with what the ATF agent had testified to. So the terms and what they're meaning was not in dispute. China White refers to heroin. RAC is $1,000. The black was black tar heroin. And the — the bottom line was that Foster was talking — talked to Guzman about a prospective purchaser. That's Leshawn Jones. Says, I know someone that wants to get one. At the explicit mention of China White, which is — for a moment, Guzman breaks code and says China White, which is an explicit reference to heroin. Foster knows exactly what that means and tells him you don't have to go into all the DET details. He didn't finish the word. And then quickly ends the call. He then goes on to arrange for Jones to meet Guzman, to meet his contact. That's on December 26, 2014. Jones refuses, says she doesn't want to meet anyone without Foster, and reiterates that whatever she does will be beneficial for the both of us. So the — I think Your Honor asked a very good question of — of my — of opposing counsel, which is the — the communications themselves. Aren't those sufficient? Isn't that sufficient? Yes, they are, because the crime is the agreement. And what you have demonstrated in these telephone calls, these communications, not with an undercover police agent, not with a confidential informant, but Foster and co-conspirators, is the agreement, the agreement to obtain, to distribute, to possess with intent to distribute heroin. Did you try the case? I did not, Your Honor. No. I stepped in to finish the briefing and then for the oral argument. From what you could tell, was his defense consistently that he was acting in an official capacity? Yes. That is my recollection. And from my review of the record — He was actually investigating this? Correct. He was the deputy chief for the Fresno Police Department. He was the number two in the department, a rather large department in a significant population. And as he testified, he loved being a police officer. And that appears to be what drove the — his defense strategy, which is disclaiming buyer-seller. He was asked pointedly, did you conspire with anyone to obtain narcotics? He said, absolutely not. And there are — the denials are at ER 395, 722, and 751. Very stark and direct. He's asked whether he was obtaining an ounce of heroin for anyone. He said, absolutely not. But his position as — He had been — if he had asked for buyer-seller instruction, it would have been inconsistent with his whole defense. Correct. Correct. His defense was not that he was simply buying for personal use or had this arm's length relationship. And plus, what you gather from these communications, too, is a very close relationship between Foster and Guzman, for example. Guzman calls him uncle. Foster calls him nephew. And then a close relationship between Foster and LaShawn Jones, where they're referring to each other as baby or sweetie, what appears to be a romantic relationship in those communications. So it's not — it would not be, in any event, even if he had made any allusions to buyer-seller, it wouldn't really fit the evidence anyhow, because it was a close relationship, an ongoing relationship. Then the heroin conspiracy, the end of it — in fact, there's a call where Foster calls Jones. This is January 31 of 2015, and is very angry, and he recounts a story — he recounts a situation where he's trying to do something for her, in his words, and it's almost gunplay because the people he's dealing with thinks he's trying to set them up because he can't get ahold of Jones. And then it ends with Jones, a few days later, telling Foster that she got the items from another source, but was upset because it was poor quality. Can I change the focus just for a minute? The — Foster, of course, has asked to be released on bail pending appeal, primarily because, as a former policeman, he fears that he will be subject to additional risk of death or injury. What's the government's response to that? Your Honor, the Bureau of Prisons, my understanding, handles all sorts of defendants, including those that may face retribution or repercussions from — maybe not individuals they may have as an investigator or law enforcement officer put in prison, but folks that have cooperated or have other issues that may make them a target within the inmate population. My understanding is they do a very good job in protecting those individuals that have issues and housing them in secure ways so that they're not subjected to retaliation. Like Whitey Bulger? Perhaps not the best example, but they do handle a great many inmates throughout the country, and, thankfully, those situations are rare. Well, theoretically, we ought not to be concerned about it because the BOP does such a good job in protecting these folks. I think that's correct, Your Honor. I mean, there are those exceptions, but they're rare. And in this instance — Let me ask you. You say they're rare. Do you know that, or is it a fact? Can you give us any information on that? I don't have any statistics on that, Your Honor. Do you know it as a fact that it's rare? Do you have any information at all on what the rate of injury or death is to people who are there in protective status? I don't, Your Honor. I can obtain that information if the Court wishes. So you don't know if it's rare, then? Just from my experience as a prosecutor in the office, just instances where I've heard of that occurring where an inmate — where Whitey Bulger is one pretty common example. But I can dive in. I can gather more detail on it if it's a court — if it is a concern of the Court, and I can submit a supplemental to you, Your Honor. What kind of standard of review, if you will, do we consider in connection with this particular request by Mr. Foster, meaning the release pending appeal? Well, it is a narcotics case, so he would bear the burden. I think he's — part of the component is showing a substantial issue. I don't think he's done that. Another part would be showing by clear and convincing evidence he's not a flight  I don't know if — Again, would he have to show some specific threat where someone had threatened him, or is a general allegation sufficient? I think the burden for such a motion would be in the hands of the defendant, Mr. Foster, and there would have to be a threshold showing, I believe, that the risks are real and not merely speculative. I'm a little confused by this. Isn't there a separate provision for appeal of bail? Yes. That has to be decided within a certain time, and did that — was that invoked here? I don't think there was a rule. I think it's — is it 9B of the Federal Rules of Appeal Procedure? I don't believe there was a bail motion made. So this hasn't been before a panel of this Court's promotions panel, or? I don't believe so, Your Honor. Is it raised? I came — again, I came into the case mid-briefing, so I don't know if there was a bail motion before that may have been denied. I think — Okay. We can ask the procedural question. Sure. Moving on to the sufficiency of the evidence with respect to the marijuana conspiracy, again, the communications between Foster and his nephew, Denny Foster, about prices, what's the ticket that's lying for the price, units, the quantity of marijuana, timing to a profit. All of these were in evidence. They were in evidence. Now, I know Mr. McNeely explained there was one exhibit that was presented during the defense case in chief, and that's correct. It's Exhibit 78. It only has to do with the marijuana conspiracy. It does not have to do with the heroin conspiracy. But even exercising — and it was a conversation regarding Denny Foster proposing that they get three units. Speaking of marijuana, Foster would buy two. Denny Foster would buy one. Even exercising that for purposes of just evaluating the government's case in chief, there are still conversations days before that and then days after that, a conversation that Foster had with Denny Foster's girlfriend, Desiree Carbajal, when Denny was arrested with six pounds of marijuana seized. So even exercising the incrementing communications in Exhibit 68, there are still several items of evidence, including that one where Foster is upset that Denny Foster didn't give him a heads-up on where he was going and what he was doing that day so that he could, quote, provide cover for him. And then after Denny Foster's arrested, then Keith Foster calls LaShawn Jones and warns — tells her about the situation and warns her to be extra careful. Not the evidence that this is not — this is not legitimate police behavior. It's a criminal conspiracy against spanning two different narcotics — groupings of narcotics and individuals. With respect, moving to the Rule 29 issue, which I know Mr. McNeely spoke a little bit on, in this instance, the state of the evidence, and as stated by the district court when evaluating these motions at the trial court level, the state of the evidence was that even — notwithstanding that there was no Rule 29 motion made at the close of the government's case, the evidence was sufficient. And the government, of course, agrees with that determination. You had the incriminating wiretap communications, and then you had Foster's admissions after he was arrested, where he states, my family got me into this, I let my boys down, I let my community down, I let the police chief down, and I intend to resign as a — from the Fresno Police Department. All those taken together would make a Rule 29 motion at the close of the evidence futile. And more than that, I think Mr. McNeely stated there was no possible tactical reason. Well, if — if the defense believes that the motion at the close of the government's case would have been futile, that is, he had him on these calls talking with a heroin dealer about China White and pricing, and then talking about providing cover for his marijuana-dealing nephew, detailing a Rule 29 motion would only at that point assist the government in filling holes or shoring up potential weaknesses. And there was no reason at that point, knowing that the next witness for the defense was going to be Keith Foster, who said — Are you arguing there was a tactical decision, possibly, to not make a Rule 29 motion? I'm arguing that there could have been, Your Honor, and that it should not be assumed that it was — that there was no possible logistical reason for it. That's one possibility. The district court — at the trial court level, the district court assumed — just got to the prejudice prong and just decided it on that basis, and assumed that the first prong, that is, that whether there was a tactical reason for it wasn't an issue, and denied the motion based on there being no prejudice because the evidence was sufficient. But just in response to Mr. McNeely's argument, there are possible arguments that can be surmised to — to demonstrate that there could have been a tactical reason for it. We don't know what that is because the record is not developed on prong one. And so it's just — Has there been any case you're aware of where it's been found that there's a tactical reason not to make a Rule 29 motion? I have not found one, Your Honor. But your — I gather the government's argument is even if it had been made, it would have been unsuccessful because — Correct. — what it had been — Because of the strength of the evidence. — admitted to and so on, it would have been futile. Correct. Because of the strength of the evidence. And then, if the Court has no more questions, I would ask that the convictions below be affirmed. Thank you, counsel, for your argument. So, we have rebuttal. Your Honors, I regret that I haven't teed up the issues as well in my brief as I would have liked so that you're — you are sort of blindsided by where I'm coming from. But I urge you to realize that what Detective — or what Deputy Chief Foster testified to and what he argued at trial is irrelevant to the issue that we're arguing, which is if the trial court had been presented fairly with this motion and had been focused on the evidence that had been presented, it would have granted it. But, counsel, isn't that, with respect, a really bizarre argument? You're saying if my counsel had — my client had testified differently than he did and the motion had been made, they would have ruled differently. But he's always bound by what he said, isn't he? I mean, say he went up there and he said, you know, I'm guilty of this conspiracy. I did the whole thing. I mean, I planned it all along and so on. Somebody makes a Rule 29 motion. You're saying we should say, well, you should have granted that Rule 29 motion? Well, Your Honor, with respect, what I'm telling you is there's nothing different from Mr. Foster and Mr. Loveland, Mr. Melchor Lopez, Mr. Tyler, all of these other gentlemen who were convicted of conspiracy and their cases were overturned because although they were drug dealers and they were clearly involved in drug deals, they were not conspirators as charged by the government. That's the issue here. The government has played bits and pieces of telephone calls over three months. No transactions occurred. Nothing, this man was followed religiously for two or three months. Nothing was ever witnessed. He was never found in possession. And no one who was in a conspiracy with him came forward to testify. What element was missing from the conspiracy charge that you claim would have resulted in a Rule 29 being granted? We argue both were missing, the intent and the agreement. First of all, there was the only evidence of intent that they present to say that he intended for these drugs to be possessed were these statements made on the telephone. None of them were backed up by any conduct, and it's entirely consistent with somebody basically shining on sources. Also, there was no agreement. There's no amounts, there's no times, there's no agreement to when, and there is no follow-through with any of it. With regard to heroin, she contacts him right before Christmas. Nothing ever happens. In February, after a month's silence, she says, well, I obviously went somewhere else. There was no promise that he would get anything or do anything. With regard to marijuana, you hear the government has played for you and presented for you dozens of, or many phone calls between marijuana co-conspirators, Ricky Reynolds up in Northern California and Denny Foster down in Fresno. What do we do, counsel, with respect to your client's statement, confession, that he'd let the department down and, you know, he did some bad stuff and he was going to resign? What do we make of that? Your Honor, he was being truthful. He knew what he had done was wrong, but he was not confessing to conspiracy. What did he do that was wrong? Pardon me? What did he do that was wrong from your perspective? He didn't report people in his family who he knew were involved in drug dealing, and he behaved in a way that showed them that he didn't disavow what they were doing. He caused great embarrassment to his family and great embarrassment to the force, but he did not acknowledge that he committed a conspiracy, which is what the government is arguing here. But it could be interpreted that way, right? And the jury did interpret it that way. Well, with respect, Your Honor, the much stronger case the government presented and the bulk of the evidence they presented was directed to eight or nine charges that the jury did not find. Right. So why do you think they found what they did since they didn't find on the other points? I haven't successfully convinced you yet, but I believe it's because they weren't instructed properly. Okay. We're back to the buyer-seller instruction. I believe that if they had been told what your court has ruled in Loveland and Your Honor was on the Moe decision where they listed ten factors, your colleague did, and most eight or nine of those factors don't even apply in this case. Did you try the case? I did not. I was retained. No. Well, do you disagree with the government that his position, his defense at trial was that he was acting officially, he was investigating? I do disagree. Okay. And I have – I would concede that they're right about the jury motion. But the issue at the trial was the Fresno Bee misrepresented the opening statement and said that Keith Foster was deep undercover. And that became an argument in the trial that both sides responded to that had never been made by the defense. That's what we argued in our motion to release juror information, was we believe the jurors were influenced by an article in the paper that got the defense wrong. And then the defense began to adopt. What was the defense? The argument that the jury – that the defense made was that he wasn't engaged in transactions with these folks that weren't sanctioned, that the transactions he was engaged with were attempts to – for lawful – law enforcement purpose. And it helped us. Your client got buzzed. Pardon me? Your client got buzzed by the Sacramento Bee. The Fresno Bee in our case. The Fresno Bee. Let me just ask you a quick question. Wasn't the time to ask for the juror questions – questions – information about the jury at the time of the trial when the jurors were there? They could have been asked, have you read this? Anyone heard anything about this article? It may have been, and that may be an IAC issue. I don't believe trial counsel was aware at the time that he hadn't said it. I was the first counsel to receive the transcripts of the oral argument. Well, hasn't that been waived? I'm not sure it's been waived.  At the time, they had them all there. We weren't able to locate the jurors because we don't know who they are. I'm sorry. What did you just say his defense was? The defense at trial? Yeah. The defense at trial was that he was attempting to help these two men avoid further criminality by setting up transactions with others. He was attempting to facilitate their work as CIs or to get some benefit as though they were pseudo-CIs. That was the argument at trial. But every time he identified someone who was involved in this attempt, they were brought on and said, we were not involved in that. That's not true. There was one officer, Brandon Kirkland, who, at the time, was assigned to the Narcotics Bureau at the Fresno Police Department. He played a telephone call, which he wasn't a participant in, and said, are you my boy that's being referred to here? And he said no. The government has made hay as though he's denied involvement, but he wasn't given any context about the call and wasn't informed about the basis for the question at all. He hadn't heard the evidence other than the statement, are you my boy? Other questions by my colleagues? No. All right. Thank you both for the argument. Thank you. The case just argued is submitted.
judges: Schroeder, M. Smith, Rayes